# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUG TRAHER, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 19-1202 |
| v. | : | |
| REPUBLIC FIRST BANCORP, INC., | : | |
| Defendant. | : | |

**McHUGH, J.**  January 13, 2020

## MEMORANDUM OPINION

This is an action brought by a shareholder of a publicly traded corporation alleging that it breached its articles of incorporation by improperly conducting a vote on a proposed amendment that would double the corporation's shares. The irregularity at the center of the case was the corporation's failure to follow the rules for counting the votes as set forth in the proxy statement for the vote. Plaintiff contends that its failure to follow the announced rules constitutes a breach of the articles of incorporation, which he has a contractual right to enforce.

Although courts have frequently described articles of incorporation as a form of contract, they most often have done so in the context of determining how those articles should be construed. The bounds of corporate governance are largely prescribed by statute, and shareholders have various well-established remedies to cure their injuries. But no provision of Pennsylvania's Business Corporation Law, *see* 15 Pa. C.S. § 101 *et seq.*, and no case interpreting that law recognizes a direct cause of action in contract, enforceable by an individual shareholder, for breach of a corporation's articles of incorporation. In any case, even if one assumes the existence of such a remedy, Plaintiff here is hard-pressed to establish a literal breach of the

corporation's articles. Instead, the injury of which Plaintiff complains arises out of the corporation's failure to conduct the vote in accordance with the procedure outlined in the proxy statement. I therefore conclude that Plaintiff has failed to state a claim for breach of contract under Pennsylvania law. Plaintiff also claims to have been "aggrieved" by the corporation's alleged miscounting of votes. *See* 15 Pa. C.S. § 1793. Although I have serious questions on the record as it stands whether Plaintiff has been aggrieved in the sense Pennsylvania law intends, making such a determination at the motion to dismiss stage is inappropriate. Defendant's Motion to Dismiss will therefore be granted in part and denied in part.

**I.      Factual Allegations**

In early 2016, the Board of Directors of Defendant Republic First Bancorp, Inc. ("Republic") proposed to Republic's shareholders to amend the corporation's Articles of Incorporation ("Articles"). The amendment, known as the Authorized Shares Amendment, proposed doubling the amount of authorized common stock Republic could issue, from 50 million to 100 million shares. Compl. ¶ 1. Plaintiff Doug Traher was a Republic shareholder at the time of the vote on the Authorized Shares Amendment.

In advance of the meeting at which the Authorized Shares Amendment would be voted on, Republic filed with the Securities Exchange Commission a Schedule 14A Definitive Proxy Statement. Compl. ¶ 14. In the Proxy Statement, Republic disclosed that shareholders would be asked to consider four proposals. Compl. ¶ 18. Proposal 1 sought the reelection of two directors. Proposal 2 sought shareholder approval of the Authorized Shares Amendment. Proposal 3 sought shareholder approval to adjourn or postpone the 2016 Annual Meeting if there were not enough votes to constitute a quorum or to approve Proposal 2. Proposal 4 sought shareholder ratification of the appointment of an accounting firm.

The 2016 Proxy Statement also detailed the voting procedures for Proposal 2, the Authorized Shares Amendment.  Pursuant to Schedule 14A, a company must disclose in its proxy statement "the method by which votes will be counted, including the treatment and effect of abstentions and broker non-votes under applicable state law as well as registrant charter and by-law provisions."  SEC Schedule 14A, 17 C.F.R. § 240.14a-101 (Item 21(b)).  Republic's Proxy Statement acknowledged that "[p]ursuant to an express provision in our articles of incorporation, Proposal 2 to amend the articles of incorporation to increase the authorized number of shares of common stock will be approved if at least sixty percent (60%) of the votes entitled to be cast are voted FOR the proposal."  Compl. ¶ 19 (citing 2016 Proxy Statement). The "express provision" in Republic's Articles of Incorporation permitted the Articles to be amended "only by the affirmative vote of holders of outstanding shares representing at least sixty percent (60%) of the votes entitled to be cast for that purpose."  Compl., Ex. 1 (Republic Articles of Incorporation).

Further, the 2016 Proxy Statement instructed how shares held in "street name" would be counted.  In the United States, most public company shareholders hold their shares in "street name," that is, the investor, known as the "beneficial owner," holds shares through an intermediary, like a broker, known as the "nominee" or "record holder."[1]  Street name ownership of stock adds complexity to shareholder voting.  Generally, if the beneficial owner provides voting instructions to the broker in advance of the shareholder meeting, the broker is obliged to follow the owner's instructions.  But if the beneficial owner does not provide the broker voting instructions, the broker's authority to vote those uninstructed shares depends on the nature of the

---

[1] For some background on "street name" ownership and how it might influence corporate decision-making, see Jill E. Fisch, *Standing Voting Instructions: Empowering the Excluded Retail Investor*, 102 Minn. L. Rev. 11 (2017).

action for which the corporation seeks approval. New York Stock Exchange rules permit brokers to vote uninstructed shares only on "routine" matters. On more significant, "non-routine" matters, however, without voting instructions from the beneficial owner, the broker is not permitted to vote shares held in street name.[2] When the broker does not receive instructions for how to vote shares on a non-routine issue, such a vote cannot be counted and a "broker non-vote" on that issue results.

As relevant here, the 2016 Proxy Statement informed shareholders that if a beneficial owner failed or declined to provide voting instructions to the broker, "the brokers would not have authority to cast a vote and a 'broker non-vote' would occur." Compl. ¶ 21. The 2016 Proxy Statement went on to explain the implications of a broker non-vote. It stated that "[b]ecause the vote necessary for approval [of the Authorized Shares Amendment] is based on the number of votes entitled to be cast, and not the number of actual votes cast at the annual meeting, abstentions and broker non-votes will effectively be votes against the proposal to increase the authorized number of shares of common stock." Compl. ¶ 22.

The 2016 Annual Meeting was held on April 26, 2016. Compl. ¶¶ 24-25. Two days later, Republic filed an 8-K with the SEC and disclosed that the Authorized Shares Amendment had passed. ECF 3, at Ex. 3. No "broker non-votes" were recorded for the Authorized Shares Amendment, Compl. ¶ 25, even though a substantial number of shareholders purportedly withheld voting instructions from their brokers, *id.* ¶ 3, and the Amendment passed when it otherwise would have failed. *Id.* ¶ 5.

---

[2] New York Stock Exchange rules in effect since 1937, particularly Rule 452, have granted brokers discretionary voting authority with respect to so-called routine matters. Rule 452 provides that if the beneficial owner does not provide voting instructions to the broker sufficiently in advance of the shareholders meeting, the broker, with certain exceptions, is free to vote those uninstructed shares as she sees fit. *See* Order Approving Proposed Rule Change to Amend NYSE Rule 452, Exchange Act Release No. 34-60215, 74 Fed. Reg. 33,293, 33,294 n.14 (July 10, 2009). As it stands, Rule 452 defines twenty-one items as non-routine.

Plaintiff does not specifically plead damages or other injury. Instead, he alleges in general terms that he and "the Class Members are being, and will continue to be, harmed." Compl. ¶¶ 47, 53. By way of relief, he seeks attorneys' fees, as well as declarations that (i) the Authorized Shares Amendment did not properly pass, and (ii) all shares sold by Republic pursuant to the Shares Amendment "are unlawful, invalid and void." Compl., at 12.

## II. Standard of Review

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

### A. Plaintiff does not plead any literal breach of the Articles of Incorporation

As a point of departure, I will assume the existence of a cognizable claim for breach of contract under Pennsylvania law, and test Plaintiff's claim by applying the literal terms of Republic's Articles of Incorporation to the facts pleaded. Plaintiff contends that Republic breached contractual obligations owed to its shareholders by permitting brokers who held Republic stock in "street name" to vote on the Authorized Shares Amendment even though those brokers did not receive voting instructions from the beneficial owners of the shares. Compl. ¶ 46. The only term of the Articles identified by Plaintiff as having been breached is Article XI. That provision permits the Articles to be amended "only by the affirmative vote of holders of outstanding shares representing at least sixty percent (60%) of the votes entitled to be cast for that purpose." Compl. ¶ 14; Ex. 1 (Republic Articles of Incorporation).

The crucial term is "holder." The only sensible way to understand "holder" as that term is used in Article XI is that it refers to the entity identified in Republic's corporate records at the time of voting as the holder of the relevant shares. For shares held in street name, that entity

5

would be the broker, not the beneficial owner. Republic's corporate bylaws confirm this construction. Section 8 of the bylaws, titled "Voting," notes that "each *holder of record* of shares of stock of the Corporation . . . standing in his name on the records of the Corporation" can vote. ECF 3-2, art. 1, sec. 8 (emphasis mine). Moreover, Plaintiff seems to concede that the term "holder" as used in Article XI refers not to the beneficial owner but to the broker. In his opposition to Republic's Motion to Dismiss, Plaintiff acknowledges that he is the "beneficial owner" of his stock whereas the broker is the "record holder" or, later in the same paragraph, the entity "that holds those shares." Plaintiff's Opp. to Def. Mot. to Dismiss, at 4, ECF 6 (hereinafter Plaintiff Opposition). In any case, nowhere in his Complaint does Plaintiff argue that he was the "holder" of Republic shares as that term is used in Article XI at the time of the vote. Here, on the facts as pled, votes were cast by the "holders" and counted in accordance with the literal terms of the Articles.

Admittedly, Plaintiff might argue that brokers were not "entitled" to vote as required by Article XI. That argument depends upon a wholly separate document—the 2016 Proxy Statement—which described a procedure for counting votes that was subsequently not followed. But the fact remains that the votes Republic counted and reported to the SEC were in fact votes of "holders" of the shares as specified by Article XI. Perhaps sensing that infirmity in his argument, Plaintiff implies that the Authorized Shares Amendment was a "non-routine" corporate matter under Rule 452 and, as such, one on which a broker could vote only with instructions from a beneficial owner. Plaintiff Opposition, at 4. But Plaintiff fails to cite any particular provision of Rule 452 that supports his position. Upon review of the twenty-one corporate actions Rule 452 deems non-routine, the Court is unable to identify any that might lend

6

credence to Plaintiff's position. At the pleading stage, mere conclusory allegations are not enough.

The irregularity of which Plaintiff complains arises out of Republic's failure to follow the instructions it published in the 2016 Proxy Statement, not out of the language of the Articles themselves or how they literally apply. That logical inconsistency underscores the conceptual awkwardness of Plaintiff's attempt to proceed under a contract theory. Applying standard contract principles, how should the 2016 Proxy Statement be understood to relate to the Articles of Incorporation? It cannot be understood to modify the Articles, because they can be amended only by a majority vote of the shareholders, and a statement issued by management certainly does not suffice. *See* Def. Mot. to Dismiss, Ex. 1, at 13, ECF 3 ("These Articles of Incorporation may be amended, subject to the laws of the Commonwealth of Pennsylvania . . . by the affirmative vote of the holders of outstanding shares of stock of the Corporation representing a majority of the votes entitled to be cast."); *see also* 15 Pa. C.S. § 1911 *et seq.* (outlining procedures for amending a corporation's articles of incorporation); *cf.* 15 Pa. C.S. § 5911 *et seq.* (outlining same for nonprofit corporation). In short, Plaintiff can only establish a beach of Article XI by way of reference to the Proxy Statement, which is legally insufficient to modify the terms of the Articles themselves.

For that matter, the record is silent as to how the inconsistency arose. Was the proxy statement in error, or did a mistake happen in the process of counting the votes? There is no allegation that management deliberately misled shareholders, only an allegation of inconsistency between what the 2016 Proxy Statement provided and how the votes were actually tabulated. In

the final analysis, the Complaint as pled establishes that the votes of "holders" were counted, undercutting any claim that there was a breach of the Articles of Incorporation.[3]

### B. Plaintiff has not shown that Pennsylvania recognizes a contractual cause of action for breach of a company's articles of incorporation

Separately, I am unpersuaded that Pennsylvania recognizes a contract remedy on behalf of an individual shareholder arising out of a corporation's purported failure to follow its Articles. In opposing Republic's Motion to Dismiss, Plaintiff boldly contends that an "unbroken line of cases" demonstrates that "state and federal courts nationwide have held that articles of incorporation are a contract between the corporation and its shareholders." ECF 6, at 7. But he cites nothing in Pennsylvania's Business Corporation Law and no Pennsylvania case to support that proposition.

Plaintiff's unbroken line begins with two pre-Civil War cases—*Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819), and *In re St. Mary's Church*, 1822 WL (7 Serg. & Rawle) 1868 (Pa. 1822). Neither case much advances Plaintiff's cause. In *Dartmouth College*, the Supreme Court declared unconstitutional a New Hampshire law that amended the charter that had been issued to Dartmouth College. The charter had been granted before the Revolution by the British Crown and established the College as a private institution with a board empowered to appoint and remove its president. Following independence, a succession dispute arose, and the New Hampshire legislature intervened by passing a statute that sided with one faction, voiding

---

[3] Similarly, another element of a claim for breach of contract is damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) ("It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."). Plaintiff here pleads no damages, only some unspecified harm, and seeks a declaration that shares sold after the Authorized Shares Amendment passed should be deemed void. But such a declaration, coming three years after the Amendment was adopted, would have profound implications for every other shareholder and the corporation itself, which is why, as discussed below, Pennsylvania's Business Corporation Law contemplates derivative actions that globally consider the interests of every party with a stake in the enterprise.

8

the previously issued charter. The Supreme Court declared this legislative takeover unconstitutional as a violation of the Contracts Clause, which forbids state and local governments from passing laws that "impair[] the Obligation of Contract." U.S. Const. Art. I, Section X, Cl. 1. In doing so, it stated that "because charters of incorporation are of the nature of contracts, they cannot be altered or varied, but by consent of the original parties." *Dartmouth College*, 17 U.S. at 594. Although Plaintiff is correct that Chief Justice Marshall's opinion in *Dartmouth College* is the original source of the proposition that contract principles should be applied in construing articles and other corporate documents, such recognition falls well short of recognizing a cause of action for breach, particularly with the development of comprehensive and sophisticated state statutory schemes meant to govern corporate affairs.

Three years after *Dartmouth College*, the Pennsylvania Supreme Court faced a similar internal dispute between lay and clerical trustees of St. Mary's Church, whose charter as a charitable corporation was approved by the state legislature. The court held "if one of the clerical members be excluded from the board, by a resolution of the lay members, without authority, resolutions for alterations of fundamental articles of the charter, in the absence of such member, are unlawful." *In re St. Mary's Church*, 1822 WL at *1 (Pa. 1822). Plaintiff is correct that one of the justices opined that "the [corporate] charter is a contract between the state, the founder and the objects of the charity, all of whom are bound by its terms." *Id.* at *30. But that language was issued not by the full court but from that judge writing *seriatim*.[4] And even if it

---

[4] "Seriatim opinions" are a "series of opinions written individually by each judge on the bench, as opposed to a single opinion speaking for the court as a whole," and are roughly equivalent to what we now refer to as concurring opinions. *See Seriatim*, Westlaw Black's; *see also* John P. Kelsh, *The Opinion Delivery Practices of the United States Supreme Court 1790-1945*, 77 Wash. U. L. Q. 137 (1999). In *St. Mary's Church*, three of the justices wrote separately.

9

represented a holding by the full Court, Plaintiff would go too far to construe that language as endorsing an individual cause of action like the one he asserts here.

It bears emphasis that *Dartmouth College* involved a preexisting corporate charter, and the Court was addressing the scope of governmental power to alter its terms relatively soon after the adoption of the Constitution. Identifying and explicating the rules of corporate governance was certainly not the focus of that Court.[5] Indeed, soon thereafter, the Supreme Court limited the reach of the Contracts Clause by holding that it did not limit the ability of the government to regulate the terms of *future* contracts. *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213 (1827). In doing so, the Court reasoned that contracts at least by implication incorporate controlling principles of the law at the time of the agreement, and therefore such laws cannot be viewed as an "impairment" of a contract when the contract is executed. *Id.* at 264. And that insight from *Ogden* is borne out by that fact that corporate governance documents routinely incorporate state law remedies for shareholders to address corporate wrongdoing.

Plaintiff relies on additional cases to support his arguments, but nearly all of them apply Delaware law. Plaintiff first cites *Lawson v. Household Finance Corp.*, 152 A. 723 (Del. 1930). *Lawson* cited the language from *Dartmouth College* about the contractual nature of foundational corporate documents, but did so in the context of a corporate defendant asserting a right to limit stock transfers. *Id.* at 727. In *Lawson*, both the corporate charter and bylaws provided that the corporation must be given the opportunity to repurchase stock before it was offered for sale to a third party. *Id.* at 726. Significantly, that limit on the power to transfer shares was endorsed on each stock certificate itself. *Id.* at 729. Given that limited context, the *Lawson* Court cannot be

---

[5] Even in his opinion, Chief Justice Marshall admitted that "[i]t is more than possible that the preservation of rights of this description was not particularly in the view of the framers of the Constitution." *Dartmouth College*, 17 U.S. at 644.

10

said to have recognized a general common law remedy in contract for a corporation's alleged breach of its articles. Moreover, *Lawson* was applying the General Corporation Law of Delaware (DGCL), which has been interpreted by courts to authorize a broad array of remedies for individual shareholders.

Plaintiff next cites *In re Activision Blizzard, Inc. Shareholder Litigation*, 124 A.3d 1025, (Del. Ch. 2015), a decision from the Delaware Court of Chancery. Plaintiff claims that *Activision Blizzard* provides that "[s]tockholders similarly can sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the [corporation statute]." Plaintiff's insertion of brackets at the end of the quote is misleading. At that point in the opinion, the Court of Chancery was specifically citing to Delaware's General Corporation Law. *Id.* at 1050. Read accurately, *Activision Blizzard* merely highlights the scope of remedies provided by the DGCL, without reference to Pennsylvania law.

Elsewhere in its opinion, the *Activision Blizzard* Court outlined the various specific rights of individual shareholders conferred by Delaware corporate law. For example, the Court noted that shareholders may bring direct claims against a corporation, "includ[ing] the causes of action conferred on stockholders by specific statutory provisions of the DGCL." *Id.* at 1049. The Court further noted that "[d]irect claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws, recognizing that the DGCL forms a part of every Delaware corporation's charter." *Id.* To support that proposition, the Court cited multiple provisions of the DGCL conferring such rights on individual shareholders. *Id.* at 1049 n.6 (citing various provisions of the DGCL providing shareholders with individual causes of action). In short, Plaintiff's reliance on *Activision Blizzard* to support his generalized claim for a common law right to sue in contract is misplaced.

11

*Activision Blizzard* is deeply rooted in the Delaware statute as it has been construed by Delaware courts. Plaintiff points to no similar statutory provisions in Pennsylvania's Business Corporation Law.

Likewise, *Aleynikov v. Goldman Sachs Group*, 765 F.3d 350, 366-67 (3d Cir. 2014), a case once again applying Delaware law, lends no weight to Plaintiff's position. In *Aleynikov*, a former employee of Goldman Sachs (Aleynikov) stole computer code from Goldman Sachs when he received another job, and was subsequently charged with federal and state crimes. *Id.* at 353-54. After being charged, he sought indemnification and advance payment of attorneys' fees, citing a portion of Goldman Sachs's bylaws that provided such protection to, among others, "officers" of Goldman Sachs and its subsidiaries. *Id.* at 355. Plaintiff cites the Third Circuit's observation that "by-laws are a contract among certain stakeholders," a proposition which that court believed was "not novel or controversial." *Id.* at 367 n.10.

In context, that isolated statement has little bearing here. The *Aleynikov* Court was not interpreting the corporate bylaws to determine whether they created an independent cause of action in contract for shareholders, but whether someone nominally titled as a corporate officer had individual rights under the by-laws. *Id.* Plaintiff is correct that the *Aleynikov* Court cited a Delaware case recognizing corporate bylaws as a form of contract. But the Court carefully limited any broader endorsement of that principle by noting that it was invoked for the "sole purpose" of determining the narrow issue of whether the Aleynikov was a party to the bylaws. *Id.*[6]

---

[6] Plaintiff also cites a Pennsylvania case applying Delaware law, *In re Estate of Hall*, 731 A.2d 617, 622-23 (Pa. Super. Ct. 1999), which merely holds that "the general rules of contract interpretation are held to apply" when interpreting governance documents.

In the absence of any authority under Pennsylvania law, Plaintiff's contractual claim for breach of the Articles of Incorporation will be dismissed. It should be noted that the lack of a cause of action in contract hardly leaves shareholders without remedies. In addition to seeking declaratory relief under 15 Pa. C.S. § 1793, discussed below, a shareholder can allege breach of fiduciary duty, which can be brought by shareholders through a derivative action on behalf of the corporation. 15 Pa. C.S. § 1781; *see, e.g.*, *Impala Platinum Holdings Limited v. A-1 Specialized Services and Supplies, Inc.*, 2016 WL 8256412, at *6 (E.D. Pa. Sept. 16, 2016).[7] Moreover, to the extent that Plaintiff means to suggest that the 2016 Proxy Statement was deliberately false or misleading, remedies exist under federal securities laws. *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007). Such remedies were legal options available for Plaintiff to pursue.

### C. Judicial Review of Contested Corporate Actions

Plaintiff next alleges that he and the purported class members "are being, and will continue to be, harmed" by the passage of the Authorized Shares Amendment. As to this claim, Plaintiff asserts a statutory remedy under Pennsylvania law: 15 Pa. C.S. § 1793(a). Compl. ¶¶ 49-53. Section 1793(a) provides that "any person" who has been "aggrieved by any corporate action" may petition an appropriate judicial forum to "determine the validity of the corporate action." 15 Pa. C.S. § 1793(a).

A court's power under Section 1793 and its related provisions is broad. "Corporate action" available for judicial review includes the corporation's "taking of any action on any matter" that state law or the corporation's bylaws allow to be "submitted for action to the

---

[7] Defendant contends that Plaintiff initiated a derivative claim but that, after an investigation, a Special Litigation Committee recommended against further action. ECF 3, at 7-8. Although Defendant's contention provides some context for the current action, such extrinsic evidence cannot be a basis for deciding a motion to dismiss.

shareholders" of that corporation. *Id.* §§ 1791, 1793. If a court determines an invalid corporate action took place, the court may fashion any order "as may be just and proper," including one "order[ing] a meeting" so that the corporation can rectify, reverse, address, or otherwise reconsider some previously taken corporate action. *Id.* §§ 1792, 1793.

There is a dearth of case law applying the statute, or what the Pennsylvania General Assembly meant by "aggrieved." Neither Section 1793 nor any other provision of the statute defines "aggrieved." Dictionaries and case law in other contexts define "aggrieved" similarly. The dictionaries generally agree that to be "aggrieved," a party's "personal, pecuniary, or property rights [must] have been adversely affected by another person's actions," or that party must "hav[e] been harmed by an infringement of [its] legal rights." *Aggrieved*, Black's Law Dictionary (11th ed. 2019), *available at* Westlaw. Further, under Pennsylvania case law, an applicant is "aggrieved" if it has a "substantial, direct, and immediate interest" in the resolution of some judicial action. *See, e.g.*, *Petty v. Hospital Service Ass'n of Northeastern Pa.*, 967 A.2d 439, 448 (Pa. Commw. Ct. 2009) (citing *Bergdoll v. Kane*, 731 A.2d 1261, 1268 (Pa. 1999)).[8] As relevant here, the "requirement that an interest be 'direct' simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains." *In re General Election 2014*, 111 A.3d 785, 792 (Pa. Commw. Ct. 2015) (citing *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 282-84 (Pa. 1975)).

---

[8] Most of the Pennsylvania cases that have examined "aggrieved" have done so in the context of a standing analysis. For example, in *Petty*, the court examined whether the applicant was sufficiently "aggrieved" to have standing under 15 Pa. C.S. § 5793. Like Section 1793, Section 5793 allows "any person" to petition a court to review a contested corporate action when the corporation is organized as a nonprofit. 15 Pa. C.S. § 5793(a). Moreover, *Petty* drew its definition of "aggrieved" from *Bergdoll*, which dealt with neither Section 5793 nor Section 1793 but with whether a "party seeking judicial resolution of a controversy" had "establish[ed] that he has standing to maintain the action." *Bergdoll*, 731 A.2d at 1268. Thus, *Petty*'s framework for understanding "aggrieved" applies equally well to Section 1793.

14

Thus, under Section 1793, a necessary condition of "aggrieved" is that the "person" claiming aggrievement must show "harm to his interest" caused by the allegedly invalid "corporate action."

In two federal decisions that have cited Section 1793, the courts proceeded with caution. As noted by Judge Kelly of this Court, injunctive relief in the form of judicial intervention pursuant to Section 1793 is an "extraordinary remedy" and "only granted in rare circumstances." *Spina v. Refrigeration, Service and Engineering, Inc.*, 2014 WL 4632427, at *3 (E.D. Pa. Sept. 17, 2014); *see also Simms v. Exeter Architectural Prods., Inc.*, 868 F. Supp. 668, 672-73 (M.D. Pa. Feb. 10, 1994) (noting, in denying certain injunctive relief sought by a plaintiff, that the appointment of "a receiver is, like an injunction, an extraordinary remedy, and ought never be made except in cases of necessity, and upon a clear and satisfactory showing that the emergency exists, in order to protect the interests of the plaintiff in the property involved").

Republic defines the issue in highly technical terms. According to Republic, because the votes of holders of shares were tallied in accordance with the literal terms of the Articles of Incorporation, Plaintiff cannot claim to have been "aggrieved." ECF 3, at 11-12. Plaintiff replies that as the beneficial owner of the stock he was necessarily aggrieved by a method of counting votes that was flatly inconsistent with the Proxy Statement and resulted in the adoption of an amendment that otherwise would have failed. ECF 6, at 11-13.

Although I evaluated Plaintiff's contract claim by applying a literal standard, the calculus is different where operative statute is cast in broad terms. As Plaintiff correctly observes, Section 1791 extends to "any action" that must be "submitted to the shareholders." *See Drain v. Covenant Life Ins. Co.*, 712 A.2d 273, 276 n.4 (Pa. 1998). It is therefore inappropriate to dispose of Plaintiff's Section 1793 claim on a Rule 12 motion to dismiss.

That said, it remains to be seen whether Plaintiff was aggrieved in any tangible way. And to the extent that the statutory remedy is equitable in nature, as appears to be the case, there are serious questions as to whether it would be "just" or "proper" for this Court to reach back and void the Authorized Shares Amendment by means of a federal action filed some three years after the vote occurred, when other legal remedies existed and may have been pursued. Indeed, Plaintiff's Section 1793 claim may be particularly vulnerable if on an expanded record it becomes clear that a derivative claim was asserted and explored by a Special Litigation Committee using outside counsel.[9]

## IV. Conclusion

For the reasons set forth above, Republic's Motion to Dismiss will be granted in part and denied in part. An appropriate order follows.

/s/ Gerald Austin McHugh
Gerald Austin McHugh
United States District Judge

---

[9] Section 1793 applies to for-profit corporations. There is a corollary provision applicable to nonprofit corporations in Section 5793. The case law under Section 5793 is comparatively robust. Nonprofit corporations do not have shareholders, and it may well be the case that there are fewer decisions applying Section 1793 because most disputes involving corporations with shareholders are addressed through derivative actions.